In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 14-3413 & 14-3336

CHICAGO REGIONAL COUNCIL OF
CARPENTERS PENSION FUND, ET AL.,

*Plaintiffs-Appellees, Cross-Appellants,*

*v.*

SCHAL BOVIS, INC.,

*Defendant-Appellant, Cross-Appellee.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-cv-00992
**Sharon Johnson Coleman**, *Judge*, and **Manish S. Shah**, *Judge.*

---

ARGUED OCTOBER 29, 2015 — DECIDED JUNE 10, 2016

---

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* This action was brought by four carpenter union fringe benefit funds ("the Funds") under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 502(a) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a). The Funds allege
that Schal Bovis, Inc., a general contractor that builds large
and small buildings in the Chicago metropolitan area, failed
to make fringe benefit payments for work performed by non-
union labor, as was required under collective bargaining
agreements. The Funds started with 36 claims of unpaid
fringe benefits, but proceeded to trial on only four claims. The
district court granted summary judgment to the Funds on all
four claims on the issue of liability. From summary judgment,
the parties proceeded to a bench trial on damages, and from
there both parties appeal. Schal Bovis appeals the granting of
summary judgment for two of the four claims, the calculation
of damages for those two claims, and the amount of attorneys'
fees awarded. The Funds cross-appeal the calculation of dam-
ages for one of the claims and the admission of certain evi-
dence for that calculation.

We reverse the district court's grant of summary judgment
on the two claims Schal Bovis appeals and remand for further
proceedings. In the first claim, we hold that the non-union
subcontractor should be considered a single employer with
the union signatory who ultimately performed the work.
Consequently, the Funds are prevented from claiming fringe
benefits for the work performed in that claim because Schal
Bovis subcontracted the work to a union signatory as required
by the collective bargaining agreement. In the second claim,
we hold that the collective bargaining agreement prevented
the carpenters' union from claiming work which was the ex-
isting practice of other trade unions. Since Schal Bovis pre-
sented undisputed evidence that the work performed in the
second claim was the existing practice of another trade un-
ion—the union to which Schal Bovis subcontracted the
work—the Funds cannot claim fringe benefit contributions

for the work. The remaining issues are rendered moot by these holdings, so we limit our discussion accordingly.

## I. Background

Schal Bovis has been a party to collective bargaining agreements with the Chicago Regional Council of Carpenters ("the Union") since it first signed an agreement in 1983 ("the Memorandum"). The Memorandum and a Commercial Area Agreement effective 2005 to 2008 ("the Agreement"), bound Schal Bovis to several trust agreements which provided for the creation of the Funds. The Agreement also limited Schal Bovis's ability to subcontract work "coming within the jurisdictional claims of the Union," that is, carpenter's work. According to Article III, Section 3.2 of the Agreement, Schal Bovis could not subcontract carpenter's work, which the parties refer to as "jurisdictional work," to any subcontractor who had not signed the Agreement (usually a non-union shop). If Schal Bovis did, then Section 3.5 obliged Schal Bovis either to require the non-union subcontractor to sign the Agreement itself, or to keep track of the hours worked by the subcontractor and pay fringe benefit contributions to the Funds for those hours. Article I, Section 1.1 of the Agreement described in broad, expansive terms what the Union considered to be jurisdictional work, but concluded by stating: "However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades." Doc. 13-12 at 33.

## A. The Litigation

In February 2009, the Funds conducted an audit of Schal Bovis's books covering the years 2006 and 2007. Based on the audit, the Funds claimed and demanded $8 million in unpaid

fringe benefit contributions, liquidated damages, and interest
for 36 claims of work that Schal Bovis allegedly subcontracted
to non-union shops. Over the next two years, through corre-
spondence between the parties, the Funds reduced their
claims from 36 to eight for a total of $1.25 million in unpaid
contributions, exclusive of interest and liquidated damages.

In February 2011, the Funds filed suit seeking payment for
the eight remaining claims. Early on, however, they withdrew
four of the eight claims, leaving a total of $203,000 in allegedly
unpaid contributions. In a brief two-page order, the district
court granted summary judgment to the Funds on the four
remaining claims on the issue of liability only. It left the de-
termination of damages for later, allowing Schal Bovis to pre-
sent appropriate evidence on that issue. Since only two of the
four claims are at issue in this appeal, we limit our discussion
to those two. They concern work by Canac Kitchens and Ed-
ward Don & Company.

### B. The Canac Claim

The Canac claim involved the installation of cabinetry, un-
disputedly within the Union's jurisdiction. Schal Bovis admit-
ted that Canac did not have an agreement with the Union, but
presented evidence that it had required Canac to use union
labor and that Canac had used its sister company, Qualifit
Kitchens, which had used union labor. Schal Bovis argued
that, under the single-employer doctrine, the district court
should consider Schal Bovis to have contracted with a union
shop because Canac and Qualifit were essentially the same
company. Schal Bovis presented evidence that the companies
were owned by the same parent company, did business out
of the same office, considered themselves and held them-

selves out to be the same company, and had a merged management chain. It also pointed out that Canac completed Qualifit's fringe benefit report forms and Canac paid the contributions to the Funds from its own account. Alternatively, Schal Bovis argued that, by refusing to withdraw the Canac claim, the Funds were administering their ERISA plans arbitrarily because the Funds had withdrawn other claims under identical circumstances, with no explanation for why they were treating the Canac claim differently.

The district court acknowledged Schal Bovis's single-employer argument, but dismissed it simply by stating that Schal Bovis contracted with Canac, not Qualifit. It then held that Schal Bovis presented insufficient evidence to demonstrate that it had fulfilled its obligations under the agreement when hiring non-union labor, specifically, its obligations to keep track of the hours worked by the subcontractor and pay fringe benefit contributions to the Funds for the hours worked. The district court did not address Schal Bovis's alternative argument that the Funds were arbitrarily enforcing their plans.

### C. The Edward Don Claim

The work for the Edward Don claim involved the installation of fire protection systems and stainless steel kitchen equipment. The stainless steel kitchen equipment was comprised of cooking equipment, hoods and ventilation systems, counters and tops, and freezers. Edward Don subcontracted the work to Reid's Fire and Safety Equipment. Reid's installed the fire protection systems, which the Funds conceded was not jurisdictional work. The stainless steel kitchen equipment was installed by Reid's sister company, RB Hoods, which was a union signatory with the Sheet Metal Workers. RB Hoods

used union labor from the Sheet Metal Workers and paid fringe benefit contributions to the Sheet Metal Workers.

Schal Bovis argued that it was not liable for fringe benefit contributions because the work subcontracted to Edward Don was not jurisdictional work. The definition of jurisdictional work in the Union's collective bargaining agreement was broad enough to encompass the installation of stainless steel kitchen equipment. However, Schal Bovis argued that the Union was prevented from claiming the installation of stainless steel kitchen equipment as jurisdictional work because the work was an existing practice of the Sheet Metal Workers. Significantly, Section 1.1 of the Agreement prevented the Union from interfering with the existing practices of other unions. As with the previous claim, Schal Bovis argued in the alternative that by insisting on contributions for the Edward Don work, the Funds were administering their ERISA plans arbitrarily. After all, they had already withdrawn several claims that would have interfered with other unions but gave no reason why they refused to withdraw the Edward Don claim.

The district court found that work in the Edward Don claim fit the Union's broad definition of jurisdictional work. The district court acknowledged that Schal Bovis had raised the possibility that the Funds had exempted other similar claims so as not to interfere with other unions. Nevertheless, the district court found that Schal Bovis's evidence of the circumstances of those exemptions was insufficient to demonstrate that the Funds were required by Section 1.1 to exempt the Edward Don claim. Instead, the district court reasoned that the Union could have been granting individualized accommodations.

After the issue of liability was decided at summary judgment, the parties agreed to determine damages by a bench trial on written submissions alone. The district court entered its judgment for damages in the total amount of $312,621.13. Both parties appeal.

## II. Analysis

### A. Standard of Review

The parties dispute the applicable standard of review. Schal Bovis argues that the usual standard of review applies, that is, that we review a grant of summary judgment *de novo*, with factual inferences construed in favor of the non-moving party. *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 959 (7th Cir. 2001). Conversely, the Funds argue that the proper standard of review for this case is clear error. The Funds rely on *Central States, Southeast & Southwest Areas Pension Fund v. Nagy*, 714 F.3d 545, 549 (7th Cir. 2013), in which we stated:

> However, where, as here, there is no right to a jury trial and the only issue before the district court is the characterization of undisputed subsidiary facts, we have held that the clear-error standard of review applies. Put differently, in these sorts of ERISA cases, we review mixed questions of law and fact under a clearly erroneous standard.

*Id*. at 549 (citations and quotation marks omitted).

This application of the clear error standard originated with *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992), and is unique to our circuit. *See French v. Wachovia Bank, N.A.*, 722 F.3d 1079, 1084–85 (7th Cir. 2013); *Nagy*, 714 F.3d at 549 n.1. The "sorts

of ERISA cases" in which we used this standard primarily
concerned efforts by pension funds to recover from employ-
ers who withdrew from the funds, thereby triggering "with-
drawal liability" under the Multiemployer Pension Plan
Amendments Act of 1980, 29 U.S.C. § 1381. In those cases, the
facts were not in dispute, and the only question was whether
the defendant should be held liable because it was a "trade or
business" that was "under common control" with the with-
drawing employer. 29 U.S.C. § 1301(b)(1). *See, e.g., Nagy*, 714
F.3d at 546–47; *Cent. States, Se. & Sw. Areas Pension Fund v.
Messina Prods., LLC*, 706 F.3d 874, 884 (7th Cir. 2013); *Cent.
States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d
873, 877 (7th Cir. 2011); *McDougall v. Pioneer Ranch Ltd. P'ship*,
494 F.3d 571, 575–77 (7th Cir. 2007); *Cent. States, Se. & Sw. Pen-
sion Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir. 1992).
This case is not one of those "sorts of ERISA cases." *Nagy*, 714
F.3d at 549.[1]

Moreover, as explained below, the Canac claim involves
the issue of whether the district court committed legal error

---

[1] We have been asked to extend *Slotky's* standard to other circum-
stances, but have declined the invitations so far. In *French v. Wachovia Bank,
N.A.*, 722 F.3d 1079 (7th Cir. 2013), we were asked to extend it to a case
involving Wisconsin trust law, but declined "to wade into the debate
[t]here because [w]e would affirm under either [the clear error or *de novo*]
standard." *Id.* at 1085 (quotation marks omitted). In *Jurcev v. Cent. Comm.
Hosp.*, 7 F.3d 618, 623 (7th Cir. 1993), we were asked to use the standard to
review a grant of summary judgment on a claim involving the Worker
Adjustment and Retraining Notification Act, 29 U.S.C. § 210l, *et seq*. We
similarly declined the invitation stating: "While this new standard causes
us some concern, we need not resolve any conflict between the competing
standards in this case because the class cannot prevail under either *de novo*
or clearly erroneous review." *Jurcev*, 7 F.3d at 623.

in its interpretation of the single-employer doctrine, so our review of the single-employer question is necessarily *de novo*. *Messina Prods.*, 706 F.3d at 879 (declining to apply *Slotky's* standard because the issue involved a legal conclusion, which is reviewed *de novo*); *Frey v. E.P.A.*, 403 F.3d 828, 833 (7th Cir. 2005) (same); *See also Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 (7th Cir. 2001) (same); *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894 (7th Cir. 2001) (same). And, on the Edward Don claim, the question is whether the district court misinterpreted the Agreement; our review of its interpretation is therefore *de novo* as well. *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 665 (7th Cir. 2003) (holding that we review *de novo* a district court's interpretation of a collective bargaining agreement that is clear as written); *Mazzei*, 246 F.3d at 960; *see also Church v. Gen. Motors Corp.*, 74 F.3d 795, 798–99 (7th Cir. 1996) (declining to apply *Slotky's* standard because the determinative issues in the case were matters of contract interpretation requiring *de novo* review).

The Funds contend that *Slotky* nevertheless applies because Schal Bovis has not pointed to any specific facts in dispute, the parties filed cross-motions for summary judgment, and neither requested a jury trial. But these details do not alter our duty to review the district court's decision on those cross-motions for summary judgment *de novo* and to construe all inferences in favor of the party against whom the motion under consideration was made. *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 844 (7th Cir. 2015) (conducting *de novo* review where parties filed cross-motions for summary judgment and neither demanded a jury trial). Consequently, we review *de novo* whether it was error for the district court to grant summary judgment to the Funds on the issue of liability for the Canac

and Edward Don claims, and we construe all inferences in favor of Schal Bovis.

## B. The Canac Claim

Schal Bovis argues that the district court erred by granting summary judgment to the Funds on the Canac claim because Canac and Qualifit should have been considered the same employer under the single-employer doctrine. The single-employer doctrine provides that "when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998) ("*Moriarty I*"). If the two companies were a single entity, then Schal Bovis would not have violated Section 3.2 of the Agreement, because Canac utilized Qualifit for the work, and Qualifit was a signatory to the Agreement. To determine if the doctrine applies, we examine four factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Trs. of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993). No single factor controls; we must consider the "totality of the circumstances." *Id*.

According to undisputed testimony of Canac's general manager, Nate Syens, Qualifit was the union arm of Canac and performed all of Canac's installation and service work.[2] Both Canac and Qualifit were owned by Kohler Company. The president of Kohler Company, K. David Kohler, was also the president of Qualifit. Both companies did business out of the same office, which was also a warehouse and showroom.

---

[2] Syens testified that Canac at one time employed non-union service technicians who were not employees of Qualifit, but that was several years before the events giving rise to this case.

As Canac's general manager, Syens supervised three department heads: an operations manager, an office manager, and a sales manager. Canac's operations manager, Ray Jacobson, was responsible for the day-to-day operations of Qualifit. Jacobson consulted with Syens on hiring, firing, and disciplinary decisions for Qualifit installers as needed. Canac accounts payable personnel were responsible for completing the monthly fringe benefit reports filed with the Funds on behalf of Qualifit installers. The checks used to pay the fringe benefit contributions to the Funds were drawn on Canac's accounts. When Qualifit performed the installation work for Canac at issue here,[3] Qualifit received no subcontract or purchase order from Canac, nor did Canac ever pay Qualifit for the work performed. When asked why this was so, Syens responded that it was because they were the same company. Finally, when Kohler Company eventually closed Canac and Qualifit, it was Syens who officially terminated Qualifit's agreement with the Union. This is a clear case of the single-employer doctrine. *See, e.g., Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wis. & Its Local 5*, 724 F.3d 939, 947–49 (7th Cir. 2013).

Nonetheless, the Funds argue that the single-employer doctrine can only be used by plaintiffs as a sword to establish liability, not by defendants as a shield against liability. There

---

[3] The Funds dispute that Syens's testimony established that Qualifit installers performed the work at issue. They point to Syens's admission on cross-examination that he could not, without referencing time records, say which specific installers performed the work, what hours they worked, or whether their hours were reported accurately to the Funds. Syens's inability to recall, without referencing time records, such specific details for work performed well over five years ago, does not controvert his general testimony that Canac used Qualifit installers to perform the work.

is nothing in the doctrine that mandates this limitation, and such a limitation would be fundamentally unfair. Besides, we have already held that a defendant can use the doctrine defensively. In *Moriarty v. Svec*, 233 F.3d 955 (7th Cir. 2000) ("*Moriarty II*"), we allowed the defendant to use the doctrine to argue that he did not owe contributions as an employee of one company, because he was the principal owner of another company which was found to be a single employer with the first company.[4] We stated:

> Moriarty successfully argued [in *Moriarty I*, 164 F.3d at 332–35,] that Home and WSL are a single organization such that the employees of WSL would be considered the employees of Home for purposes of contributions to the funds under the CBA. Thus, [the defendant] is correct that Moriarty is now estopped from arguing that the single employer doctrine cannot be applied in determining whether [the defendant] is an employee of Home.

*Id.* at 962. The fact that it was the plaintiff who first used the doctrine in *Moriarty I* does not diminish the fact that we allowed the defendant to use it as a shield against liability in *Moriarty II*.

The Funds further argue that we cannot hold that Canac and Qualifit were a single employer because to do so would be to render an impermissible advisory opinion. Neither Canac nor Qualifit is a party to the lawsuit, and there was no

---

[4] We were unable to resolve the defendant's argument ourselves because it relied on a factual determination not in the record. We directed the district court to make the determination on remand. *Moriarty II*, 233 F.3d 955 at 963.

dispute before the district court between Schal Bovis and Canac or between the Funds and Canac. *See Deveraux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir. 1994). "The term 'advisory opinion' is often just a conclusion; it is what you call a decision that does not resolve an actual case or controversy." *People of State of Ill. ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 941 (7th Cir. 1983). The actual controversy here is whether Schal Bovis can rely on Canac's status as a single employer with Qualifit, a union signatory, so that Schal Bovis is not liable to the Funds for subcontracting carpenter work to a non-signatory. We can resolve this question and grant relief. And, while our answer is not binding on Canac and Qualifit should they choose to contest it in the future—were they ever to come back into existence—our answer is binding on the parties to this case.

The district court ruled that Schal Bovis could not rely on the single-employer doctrine solely because Schal Bovis's subcontract was with Canac, not Qualifit. This was an error of law. The single-employer doctrine can be used defensively to determine that a company has subcontracted with a union signatory *despite* having signed an agreement with a non-signatory, just as it can be used offensively to determine that a non-signatory is liable for the obligations of a union signatory, *despite* the lack of a union agreement. Because Canac and Qualifit were a single employer, and because Qualifit was covered by a collective bargaining agreement with the Union, Schal Bovis did not violate Section 3.2 of the Agreement by assigning the work at issue to Canac. Therefore, Schal Bovis was not required under Section 3.5 to keep track of the hours worked by the installers and pay fringe benefit contributions to the Funds for those hours.

## C. The Edward Don Claim

Schal Bovis argues that the district court erred by granting summary judgment to the Funds on the Edward Don claim because the work did not fall within the jurisdiction of the Union. Specifically, Schal Bovis argues that the installation of the stainless steel kitchen equipment by RB Hoods was the work of the Sheet Metal Workers, not the Union.[5] Schal Bovis acknowledges that the work fits into the Union's broad definition of its jurisdiction found in Section 1.1 of the Agreement, which

> include[s], but [is] not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all material where the skill, knowledge and training of the Employee are required either through the operation of machine or hand tools.

Doc. 13-12 at 32. But, Schal Bovis argues that the definition is limited by the provision at the end of Section 1.1 which prevents the Union from claiming work within the established jurisdiction of other unions. Again, that provision states: "However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades." *Id*. at 33.

---

[5] The Funds concede that the installation of fire protection systems by Reid's Fire and Safety Equipment was outside the Union's jurisdiction.

Schal Bovis presented undisputed evidence that the installation of stainless steel kitchen equipment was the existing practice of the Sheet Metal Workers. The evidence included a prior jurisdictional agreement with the Plumbers Union and, most notably, an arbitration award from a 2010 jurisdictional dispute between Sheet Metal Workers Local 73 and Carpenters Local 58 of the Chicago Regional Council of Carpenters. The arbitrator found that the prevailing trade practice was that the installation of stainless steel kitchen equipment belonged to the Sheet Metal Workers. Schal Bovis bolstered its argument by pointing out that, in this case, the Funds withdrew another claim when Schal Bovis presented them with evidence during the audit that the work in that claim, which was also the installation of stainless steel kitchen equipment, was done by the Sheet Metal Workers.

Without expressly referencing the limiting provision of Section 1.1, the district court treated the provision as if it was ambiguous by looking only to the extrinsic evidence of the Funds' previously withdrawn claims. The district court acknowledged that the Funds had withdrawn other claims as a result of concessions to the jurisdiction of other unions. However, the court found that the evidence of those withdrawals showed nothing more than individualized accommodations. According to the district court, the evidence did not demonstrate that the previous withdrawals were a result of any binding contract provision. This was error.

Where an agreement is clearly written, a court should not look to outside evidence to interpret the agreement. *Dugan*, 344 F.3d at 665. If an agreement lends itself to one reasonable interpretation only, it is not ambiguous and can be construed as a matter of law. *Mazzei*, 246 F.3d at 960; *Ill. Conference of*

*Teamsters & Emp'rs Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994). The limiting provision of Section 1.1 is unambiguous when viewed in the context in which it is found, that is, union jurisdiction. The Union's definition of its jurisdiction is so expansive that it encompasses what is traditionally the work of other unions. This can lead to jurisdictional disputes with other unions over which union will perform the work in question. This, in turn, can cause serious problems for an employer who signs multiple collective bargaining agreements, each of which requires the employer to assign work based on union jurisdiction. An innocent employer, needing to choose between two different unions with overlapping jurisdictions, will find itself "caught between the devil and the deep blue." *N.L.R.B. v. Radio & Television Broad. Eng. Union*, 364 U.S. 573, 575 (1961) (quotation marks omitted). By assigning work to one union, it will necessarily violate its collective bargaining agreement with another. For this reason, it is not in an employer's interest to agree to a collective bargaining agreement with an overly broad jurisdiction definition. Section 1.1's limiting provision works to alleviate this concern. It confirms for the employer that the Union does not intend for its jurisdiction to swallow that of other unions because the Union agrees it will not claim work that other unions have established as their own.

Thus, the limiting provision at the end of Section 1.1 of the Agreement prevents the Funds from claiming contributions for work performed by another union if it is the existing practice of the other union to do that work, i.e., if the work is considered within the established jurisdiction of the other union. As mentioned above, Schal Bovis presented evidence demonstrating that the installation of stainless steel kitchen equipment was within the jurisdiction of the Sheet Metal Workers.

Furthermore, the company that ultimately completed the work, RB Hoods, was a union signatory with Sheet Metal Workers Local 20.[6]

The Funds attempted to counter this evidence by presenting thirteen letters of assignment from three contractors which purportedly assigned the work of installing stainless steel kitchen equipment to the Union. The Funds' submission is insufficient to counter Schal Bovis's evidence for a number of reasons. First, it is debatable whether the affiant through whom the letters were introduced based his statements on personal knowledge as required by Fed. R. Civ. P. 56(c)(4). Second, none of the thirteen letters assigned the work of installing stainless steel kitchen equipment. One of the letters, from 1994, assigned the work of installing "counter tops/shelving/kitchen equipment," but it does not state whether the work involved stainless steel equipment. Dist. Doc. 29 at 60. The remaining letters, which were dated 2010 or undated, either assigned only the loading and unloading of stainless steel kitchen equipment or the installation of "owner supplied equipment and fixtures." *Id*. at 48–61. Finally, it does not matter whether the Union has been assigned the installation of stainless steel kitchen equipment in the past or is assigned such work presently. It does not even matter whether the work is exclusively the work of the Sheet Metal Workers, which the Union disputes. What matters is whether it is the existing practice of the Sheet Metal Workers to install stainless steel kitchen equipment. It is undisputed that the

---

[6] Schal Bovis subcontracted the work to Edward Don, who subcontracted the work to Reid's Fire and Safety Equipment. Reid's had its sister company, RB Hoods, complete the work. The president and sole owner of Reid's is also the president and sole owner of RB Hoods.

work is the existing practice of the Sheet Metal Workers. Consequently, the limiting provision of Section 1.1 of the Agreement prevents the Funds from demanding contributions for the work in the Edward Don claim.

### III. Conclusion

In conclusion, Schal Bovis is not liable for contributions for the work performed in the Canac claim because Canac was a single employer with Qualifit; hence, Schal Bovis did not subcontract jurisdictional work to a non-signatory. Schal Bovis is also not liable for contributions for the work performed in the Edward Don claim because the Funds are prevented from claiming contributions for such work by the limiting provision of Section 1.1 of the Agreement. Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of the Funds on the Canac and Edward Don claims, and **REMAND** the case for further proceedings consistent with this opinion.